Celestina Abarca Sanfeliz, demandante y apelada, *v.*
Horacio Cordero, demandado y apelante.

Núm. 8513.—*Sometido:* Mayo 6, 1942. *Resuelto:* Junio 5, 1942.

*Harry M. Besosa* y *José López Baralt,* abogados del apelante; *R. Díaz Collazo,* abogado de la apelada.

El Juez Asociado Señor Snyder emitió la opinión del tribunal.

La demandante es dueña de la casa número 13 de la Calle Comercio en San Juan. Esta propiedad da a dos calles. Linda al Norte con la Calle Comercio y al Sur con la Avenida Pershing. La parte del edificio que da a la Calle Co-

mercio tiene dos pisos. El resto del edificio, que da a la calle del malecón, conocida como Avenida Pershing, consiste de un anexo de un piso.

Éste es un pleito de desahucio. La corte de distrito dictó sentencia lanzando al demandado del primer piso de la parte del edificio que da a la Calle Comercio y del anexo que da al malecón. El demandado ha apelado de dicha sentencia.

En el 1939 Horacio Cordero, el apelante, arrendó a Celestina Abarca, la apelada, ambas partes de la propiedad en cuestión, mediante contrato verbal de mes a mes, por una renta de $115 mensuales. En agosto o septiembre de 1940, Alfonso Zacour se interesó en subarrendar el anexo a Cordero con el fin de establecer un club nocturno frente al malecón. La renta de Cordero en aquel entonces estaba atrasada. Vió a Enrique Abarca, apoderado de la apelada, y acordó pagar la renta atrasada. Al mismo tiempo indicó a Abarca su deseo de un nuevo arrendamiento por término fijo. Explicó que Zacour había hecho planes para invertir en el anexo una suma considerable, y por tanto necesitaba un subarrendamiento por término fijo. Abarca dijo a Cordero y a Zacour que iba para los Estados Unidos continentales, pero que dejaría instrucciones a su abogado, Díaz Collazo, quien lo arreglaría todo.

Díaz Collazo llegó a un nuevo arreglo con Cordero mediante el cual se le arrendarían a éste ambas partes de la propiedad en cuestión por dos años, con opción de renovar el arrendamiento por dos más. Cordero pagaría una renta de $115 al mes. Cordero ya había pagado parte de la renta atrasada bajo el arrendamiento de mes a mes. El nuevo arreglo disponía que el pago de los restantes $335 que todavía estaban atrasados, se haría pagando $14 al mes, además de la renta mensual, durante el período original de dos años bajo el nuevo arrendamiento. También se acordó que Cordero prestaría garantía para el pago del alquiler bajo el nuevo arrendamiento, aunque nunca hubo un arreglo preciso en cuanto a la naturaleza o importe de la garantía.

Estos términos fueron satisfactorios para Zacour, ya que le permitían obtener de Cordero un subarrendamiento del anexo por término fijo. Pero Zacour insistió en que se otorgara alguna clase de convenio por escrito antes de tomar posesión de la propiedad y de gastarse en ella $7,000, que representaban todo su capital. Por tanto Díaz Collazo redactó un subarrendamiento que fué otorgado por Cordero y Zacour el 1 de octubre de 1940, mediante el cual se le subarrendó a Zacour el anexo por un mes, pero en el cual Cordero se obligó (a) a obtener de la propietaria un arrendamiento por un año con opción a renovarlo por un año adicional y (b) a subarrendar a Zacour por un término fijo similar.

Zacour y Cordero declararon sin contradicción que el subarrendamiento fué redactado por el abogado de Abarca en esta manera porque el arrendamiento escrito de ambas partes de la propiedad a favor de Cordero por un término fijo no podía otorgarse formalmente hasta que Enrique Abarca regresara a Puerto Rico. Después del otorgamiento de este subarrendamiento el 1 de octubre de 1940, Zacour tomó posesión del anexo e incurrió en grandes gastos. Abarca regresó a Puerto Rico mientras se hacían estos gastos en el anexo. Inmediatamente Zacour fué a ver a Abarca y le informó de los gastos que estaba haciendo. Zacour declaró que Abarca le dijo que todo estaba arreglado con Cordero, y que Cordero tenía un arrendamiento adecuado. Zacour además declaró que tanto Díaz Collazo como Abarca, después que éste regresó a Puerto Rico, le dijeron que no era necesario un arrendamiento escrito, y que ya existía el arrendamiento en favor de Cordero por dos años con opción a renovarlo por dos años más. Zacour declaró que después que le indicaron eso, no insistió más en que Cordero firmara un subarrendamiento, y procedió a invertir el resto de su capital y abrir el "Carioca Night Club."

Zacour empezó a explotar su club nocturno. Cordero pagó la renta estipulada de $115 mensuales, empezando el 1 de noviembre de 1940, por siete meses, más $14 mensuales, según se acordó, por los atrasos bajo el arrendamiento anterior. Además, antes del regreso de Abarca a Puerto Rico, Cordero fué donde Díaz Collazo y le ofreció en efectivo el equivalente a dos meses de alquiler como la garantía exigida bajo el nuevo arrendamiento. De acuerdo con la propia declaración de Díaz Collazo, éste sugirió a Cordero, que sería más deseable desde el punto de vista de Cordero, que ofreciera en garantía una hipoteca sobre alguna propiedad, evitando así tener muerto este dinero. Por tanto Díaz Collazo y Cordero acordaron que éste le enviaría a Díaz Collazo la escritura de una propiedad perteneciente a la Sucesión Cordero para que Díaz Collazo preparase los documentos necesarios en conexión con tal hipoteca. Cordero envió la escritura a Díaz Collazo, quien más tarde indicó por escrito a Cordero que se necesitaban ciertas certificaciones de defunción y de nacimiento, antes de que el documento de garantía se preparara en debida forma. La escritura permaneció en poder de Díaz Collazo, mientras Cordero hizo gestiones para conseguir tales certificaciones.

Mientras tanto, Abarca regresó a Puerto Rico. No habiéndose conseguido las certificaciones de defunción y de nacimiento que eran necesarias, la hipoteca que se había sugerido como garantía no se otorgó formalmente. Pero Cordero o sus subarrendatarios continuaron sin objeción en posesión de la propiedad. Y la renta de $115 más $14 por mes, prevista en el nuevo arreglo, fué pagada por Cordero y aceptada por Abarca durante siete meses.

El 14 de mayo de 1941, Abarca le escribió a Cordero que había decidido hacer algunas reformas y solicitaba que ordenara se desocupara el primer piso de la parte del edificio que daba a la Calle Comercio, cosa que estuviera disponible el primero de julio para efectuarlas. En aquella época la parte

del edificio a que hemos hecho mención estaba en realidad en poder de un subarrendatario de Cordero. Cordero declaró que en cumplimiento a lo requerido en la carta ordenó a su subarrendatario que desocupara la parte del edificio que da a la Calle Comercio. Estuvo desocupada por tres días, durante los cuales Abarca no hizo nada en relación con las alegadas reparaciones. Cordero declaró que a los tres días supo que la carta de Abarca fué motivada por el deseo de éste de obtener la posesión de esta parte del edificio con el fin de instalar allí su nueva estación radiodifusora. Cordero declaró que cuando obtuvo esta información, la cual la apelada acepta era correcta, subarrendó nuevamente la parte del edificio que da a la Calle Comercio a otra persona. Los subarrendatarios de Cordero, Zacour inclusive, continuaron ocupando tanto el primer piso de la parte del edificio que da a la Calle Comercio como el anexo de un piso. El 15 de julio de 1941, se radicó este pleito, solicitando se desahuciara a Cordero de todo el edificio.

La corte de distrito dictó sentencia a favor de la apelada, desahuciando al apelante tanto de la parte del edificio que da a la Calle Comercio como del anexo en el cual estaba situado el club nocturno. Al concluir que no existía arrendamiento entre Abarca y Cordero por término fijo, la corte inferior descansó únicamente en el hecho de que "debido a que el demandado nunca dió las garantías que la demandante exigía para perfeccionarlo, el mismo nunca se hizo". Por tanto la corte concluyó que la alegación de que existía un arrendamiento por dos años quedó "huérfana de toda prueba".

■ No podemos convenir con la corte inferior en que como cuestión de derecho bajo las circunstancias de este caso, no existía un arrendamiento por dos años. Si bien Zacour no es parte en este pleito, Díaz Collazo y Abarca entendieron perfectamente que una característica esencial del nuevo arrendamiento para Cordero era una disposición por un tér-

mino fijo, que le permitiría subarrendar el anexo a Zacour, quien exigía un término fijo que justificase los gastos que él tenía en mente hacer en la propiedad. Y no hay controversia en cuanto a que Díaz Collazo estaba autorizado a perfeccionar todos los arreglos. La siguiente declaración de Abarca indica lo que Díaz Collazo había acordado:

"P. ¿Cuando usted regresó de su viaje se firmó ese contrato?
"R. No, señor.
"P. ¿Por qué?
"R. Nunca mandó la garantía.
"P. ¿Era cierto el canon?
"R. Sí, señor.
"P. ¿Era cierto el término?
"R. Sí, señor.
"P. ¿Eran ciertas las demás condiciones?
"R. Sí, señor.
"P. ¿Por qué fué la única razón que no culminó en un contrato?
"R. Por falta de garantía."

El mismo Díaz Collazo declaró al mismo efecto como sigue:

"Naturalmente nuestra representada interesaba el contrato también, y ese contrato le fué dado bajo ciertas condiciones. Entre esas condiciones estaba la de que ofreciera una garantía a satisfacción de la propietaria."

La posición de la apelada, con la cual estuvo de acuerdo la corte inferior, está predicada casi exclusivamente en la falta de una garantía formalmente otorgada. Pero el testimonio incontrovertido demuestra que Cordero cumplió con la condición general de que proporcionara alguna clase de garantía. Difícilmente puede hacérsele responsable por la conducta de Díaz Collazo, quien estaba enteramente autorizado a actuar a nombre de la apelada, al disuadirlo de que prestara una garantía en efectivo. Cordero realizó todas las sugestiones de Díaz Collazo en lo que se refiere a la hipoteca que serviría de garantía. En verdad, la escritura de la propiedad que iba a hipotecarse todavía está en poder de Díaz

Collazo, y las certificaciones de defunción y de nacimiento que habían sido solicitadas por Díaz Collazo, fueron finalmente obtenidas y se introdujeron en evidencia por el apelante en el juicio. Resolvemos que Cordero sustancialmente cumplió con la condición de que prestara una garantía, y que el arrendamiento acordado por las partes empezó a regir el 1 de noviembre de 1940. Si fuera necesaria, puede otorgarse ahora una garantía formal.

Nuestra conclusión en cuanto a la intención de las partes se robustece por la antes descrita conducta de ambas partes desde noviembre de 1940 (véase artículo 1234, Código Civil, ed. 1930). Fué solamente cuando Abarca decidió súbitamente que preferiría tener posesión de una parte de la propiedad arrendada a Cordero, que hizo uso del pretexto de que no se había otorgado hasta entonces garantía formal en conexión con el nuevo arrendamiento, para justificar el desahucio de Cordero por el fundamento de que éste era solamente un arrendatario de mes a mes. Abarca nunca reveló esta teoría hasta que se radicó este pleito. Se le permitió a Zacour, si no se le indujo, a realizar grandes gastos en el anexo bajo la teoría de que Cordero tenía un arrendamiento por un término fijo y que la posesión de Zacour, como subarrendatario de Cordero por un término fijo, estaba por ende asegurada. Y la renta bajo el nuevo arrendamiento fué pagada por Cordero durante siete meses y aceptada por Abarca sin protesta. No hubo insistencia por parte de Abarca en que se acelerara el otorgamiento formal de la garantía, y ni siquiera se hizo mención de ella. Hasta la carta de 14 de mayo de 1941, que se alega en la demanda como la base para el pleito de desahucio, se refiere solamente al primer piso de la parte del edificio que da a la Calle Comercio, y entonces sólo pide se desocupe para hacer reparaciones, sin exigir la posesión permanente de dicha parte. Si bien es cierto que no es necesario requerimiento previo para justificar un pleito de desahucio contra un inquilino de mes a mes (artículo 1471, Có-

digo Civil, ed. 1930; *Toro* v. *Pizá Hermanos, S. en C.,* 30 D.P.R. 73), el texto de dicha carta nos ayuda al considerar la conducta de las partes con el fin de determinar la intención de éstas.

■ De igual manera no hay base para contención alguna de que el arrendamiento no entró en vigor porque hasta entonces no se había puesto por escrito. "Mutuas manifestaciones de asentimiento que en sí son suficientes para perfeccionar un contrato, no serán impedidas de operar de este modo, por el mero hecho de que las partes también manifiesten la intención de preparar y adoptar un memorial escrito de ello . . . ''. *Restatement, Contracts,* sección 26. En verdad, el artículo 1231, Código Civil, ed. 1930, dispone que "Si la ley exigiere el otorgamiento de escritura u otra forma especial para hacer efectivas las obligaciones propias de un contrato, los contratantes podrán compelerse recíprocamente a llenar aquella forma desde que hubiese intervenido el consentimiento y demás requisitos necesarios para su validez.''

Esto no quiere decir que las partes no puedan convenir en que las obligaciones legales entre ellas sean aplazadas hasta que se haga el escrito. A ese respecto su intención es el factor determinante. En este caso, después de examinar todas las circunstancias mencionadas, resolvemos que las partes contemplaban el escrito simplemente como una manera de hacer constar un contrato que ya estaba en vigor. Cf. 47 Harv. L. R. 873.

■ La corte de distrito concluyó que el caso estaba "huérfano de toda prueba'' en cuanto a que existía un arrendamiento por término fijo. La corte inferior pudo haber estado bajo la impresión de que tal fraseología de su parte era necesaria en este caso bajo la teoría de que si había un conflicto sustancial en la prueba, un pleito de desahucio no era el remedio adecuado. En verdad, el mismo apelante ha solicitado que revoquemos la sentencia por el fundamento de que existe tal conflicto. Pero tal teoría no encuentra base en

las decisiones de esta corte. Nuestros casos sostienen que un conflicto serio sobre la cuestión del título es un impedimento para un pleito de desahucio. Pero aquí no hay disputa en cuanto al título. Al contrario, ambas partes están de acuerdo en que Celestina Abarca es dueña de la propiedad. La controversia en este caso gira alrededor del derecho a la posesión, basado en un alegado arrendamiento por término fijo. Aún cuando existiera un conflicto serio en la prueba en relación a la existencia de tal arrendamiento, el pleito de desahucio es el remedio adecuado para resolver tal controversia. Esto es así porque la cuestión a decidirse en un pleito de desahucio es precisamente el derecho a la posesión. *Maceira v. Pietri et al.*, 30 D.P.R. 587.

*La sentencia de la corte inferior será revocada y se dictará una sentencia desestimando la demanda con costas.*